# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Robert Ivers,                                            Civ. No. 15-1577 (WMW/BRT)

             Plaintiff,

v.

                                        **REPORT AND**
CMFG Life Insurance Company,                     **RECOMMENDATION**
d/b/a CUNA Mutual Group,

             Defendant.

Robert Ivers, 22 Fifth Avenue South, Hopkins, MN 55343, *pro se* Plaintiff.

Colton D. Long, Esq., and Sean P. Nalty, Esq., Ogletree, Deakins, Nash, Smoak &
Stewart, P.C., counsel for Defendant.

BECKY R. THORSON, United States Magistrate Judge.

      Plaintiff Robert Ivers was named as the sole beneficiary of two life insurance

policies, totaling $100,000, that were issued to George Tallman, III, less than a year

before Tallman's death. Ivers seeks to recover the policy proceeds from CMFG Life

Insurance Company ("CMFG") based on claims under Minnesota law for breach of

contract, promissory estoppel, equitable estoppel, and unjust enrichment.[1] (Doc. No. 1,

Ex. A, Compl.) CMFG, in turn, seeks to rescind the life insurance policies on the asserted

ground that Tallman's insurance applications contained willfully false or intentionally

---

[1]     Ivers had also asserted a claim for breach of the duty of good faith and fair dealing
in his Complaint. (Compl. 5.) That claim was previously dismissed with Ivers's consent,
as were his requests for punitive damages and attorney's fees. (Doc. No. 21, 5/22/15
Order.)

misleading representations regarding his health and ability to work. (Doc. No. 7, Def.'s Counterclaim 1–6.) This case is now before the Court on Ivers's motion for summary judgment (*see* Doc. Nos. 57, 59, 68) and CMFG's cross-motion for summary judgment. (Doc. No. 60.) For the reasons stated below, this Court recommends that Ivers's motion for summary judgment be denied and that CMFG's cross-motion for summary judgment be granted on Ivers' equitable claims for estoppel and unjust enrichment, but denied on the parties' competing claims for breach of contract and rescission.

## I. FACTUAL BACKGROUND

Plaintiff Robert Ivers knew of George Tallman in years past. In September 2011, after a chance encounter at a local coffee shop, Ivers moved into Tallman's residence at the Brentwood Apartments Complex in Hopkins, Minnesota. (*See* Doc. No. 64, Wolfson Decl., Ex. 1 at 2; Doc. No. 65, Ex. 1, Pl.'s Depo. 15–17; Doc. No. 65, Ex. 3 at 3, 5.) Although the two had not seen or spoken to one another in several decades, Ivers was in between apartments and Tallman, as Ivers would later tell the police, needed someone to "care for him" because "he was deteriorating with his physical health." (Doc. No. 65, Ex. 3 at 3, 5, 7; *see also* Pl.'s Depo. 20–21.) According to Ivers's deposition testimony, Tallman was suffering from chronic psoriasis and "thrombosis or arthritis" in both knees, which made him "immobile," made it "really hard for him" to walk beyond his apartment complex on a regular basis, and would have prevented him from doing any "physical work" had he not already been retired. (Pl.'s Depo. 20, 24–25, 71.) Ivers moved in with Tallman and served as his caregiver, cooking, cleaning, grocery shopping, and delivering his rent checks to the Brentwood rental office. (*See* Wolfson Decl., Ex. 1 at 7; Doc.

No. 65, Ex. 3 at 3, 7; Pl.'s Depo. 71, 75; Doc. No. 72, Pl.'s Resp., Attach. 4 at 5.) Ivers

testified that it "would have been tough" for Tallman to perform daily tasks without

assistance, but that "he probably could have got by, barely." (Pl.'s Depo. 25, 56.) In

exchange for Ivers's help, Tallman paid all of their living expenses, which he continued

to do until his death over two years later. (*Id.* at 46–47.)

After Ivers moved in, the Brentwood property manager, Michael Mumaw,

received several complaints from residents that Ivers was verbally abusing Tallman.

(Doc. No. 65, Ex. 6, Mumaw Depo. 6–8.) Thereafter, on two separate occasions in the

fall or spring of 2013, Mumaw purportedly came across Tallman sitting on the front steps

of the apartment building having defecated in his pants. (*Id.* at 10.) When Mumaw asked

Tallman what he was doing, Tallman gave him a "blank stare" and acted "lost and

confused," like he had "no idea what was going on," "no idea of his surroundings or

where he was at the moment." (*Id.* at 11–12.) To Mumaw, Tallman appeared to be in

poor physical and mental shape, suffering from something "like dementia" and unable to

care for himself. (*Id.* at 12–13.) Concerned about Tallman's wellbeing, Mumaw

contacted Hennepin County's Adult Protective Services ("APS") in the spring of 2013,

stating that Tallman was forgetful and that Ivers was not adequately caring for him. (*See

id.* at 10–11; Wolfson Decl., Ex. 1 at 2; Pl.'s Resp., Attach. 3 at 20.) Senior social worker

Monica Listokin was specifically informed that Tallman was "skin and bones" from poor

nutrition, had "open sores on his back" and was "very scaly" from not being bathed, wore

"the same clothing every day . . . until it falls off in tatters," slept on the couch in his

"very messy apartment," and had a "bowel movement and was not able to get to the toilet." (*See* Wolfson Decl., Ex. 1 at 2–3; Pl.'s Resp., Attach. 3 at 19–20.)

APS initiated an investigation into possible caregiver neglect and financial exploitation, which began with an initial home visit from Listokin and a physician on May 22, 2013. (*See* Wolfson Decl., Ex. 1 at 4; Pl.'s Resp., Attach. 3 at 19–20.) Listokin found the conditions of both Tallman and the apartment "less dire than had been presented," reporting:

> [Tallman] appeared to have significant scaliness on his forearm. He is tall and slender, though he remained seated throughout our meeting so it was hard to determine how thin he is. He had on a sport jacket and jeans. The apartment is quite small, but it appeared to be tidy, and there was no odor. There were boxes of food neatly stacked in the kitchen.
>
> . . . Dr. Mayerhoffer discussed where there are psoriasis sores on Mr. Tallman's body — legs, arms, back . . . . Tallman stated he had been to a skin doctor less than a year ago, and no one can help him with his skin problems, so he is not interested in seeing any other doctors, or in discussing possible treatments. George Tallman fluctuated between hostility at Dr. Mayerhoffer for asking him questions, and dull listlessness staring at the TV set. Much of the time he was quiet. At one point Bob Ivers pulled up Mr. Tallman's pant leg to display the skin there, which was very dry and had patches of scabs. Mr. Tallman appeared not to notice.

(Wolfson Decl., Ex. 1 at 4.) Listokin also completed an assessment questionnaire, which noted concerns related to Tallman's physical health and cognitive functioning, but otherwise indicated that he was "[a]ble to move about the home and community without assistance" and "[a]ble to communicate." (Pl.'s Resp., Attach. 4 at 24–25.)

Listokin conducted a follow-up visit to Tallman's apartment on June 4, 2013. (Pl.'s Resp., Attach. 3 at 8, 10.) The apartment was "clean and tidy" with "a good amount of fresh dairy and food." (*Id.*) Tallman was "dressed in a t-shirt, jeans, and tweed jacket,"

and Ivers showed her a stack of clean shirts and jeans for Tallman to wear. (*Id.*) Listokin noted that Tallman "was not highly communicative" and appeared to have "memory deficits," but that he showed "flashes of humor" and stated that he was "content to have his friend Bob Ivers care for him." (*Id.* at 7–8, 10.) After her second home visit, Listokin classified Tallman as "a functional and categorical vulnerable adult" under Minn. Stat. § 626.5572, finding that he "appear[ed] to have cognitive impairments" that hindered his ability to provide adequately for his own care and to protect himself from maltreatment. (*See id.*, Attach. 3 at 8 & Attach. 4 at 27.) Listokin expressed no concerns about Tallman's physical health, however, and again found him able to communicate and "move about the home and community without assistance." (*Id.*, Attach. 4 at 28–29.) Her investigation was inconclusive as to whether Ivers had neglected Tallman. (*Id.*, Attach. 3 at 7, 15.)

Two months later, on August 24, 2013, Tallman submitted a signed application for $90,000 in term life insurance from CMFG, which listed Ivers as the sole beneficiary. (Doc. No. 63, Riehm Decl. ¶ 4 & Ex. 2 at 14–15; *see also* Pl.'s Resp., Attach. 2 at 35–36.) Ivers admits that he filled out the entire application, including Tallman's bank account information, but claims he did so on Tallman's behalf, merely reading the application questions to him and recording his responses. (Pl.'s Depo. 35–37.) The application asked, in relevant part, whether Tallman was "currently unable to work because of any illness or injury?" (Riehm Decl., Ex. 2 at 15.) Tallman's application indicated "No." By signing the application, Tallman agreed to the following:

> All my statements and answers are true to the best of my knowledge and belief. This application will be the basis of any insurance issued. I understand that: (1) benefits may be denied during the first 2 years from the effective date if I fail to give true and complete answers in this application, as described in the incontestability provision of the policy; and (2) this insurance becomes effective only if . . . the answers to questions concerning my insurability are as stated in this application.

(*Id.*) Tallman's application was approved and CMFG issued a $90,000 policy on September 9, 2013. (*Id.* at 5.) The policy provided that, "except for failure to pay premiums or fraud," CMFG could only contest the policy within two years of its effective date. (*Id.* at 11.)

In December 2013, APS launched a second investigation into possible caregiver neglect after receiving additional complaints that Ivers had been verbally abusing Tallman, that Tallman "smell[ed] like he [had] not bathed in over a month" and had recently been found in a "stairway lying on his own feces," and that his apartment was "a mess with trash and cigarette ashes all over the floor." (Wolfson Decl., Ex. 1 at 5.) Senior social worker Amy Wolfson made an unannounced visit to the apartment on December 6, 2013, finding Tallman to be quiet, calm, and "very thin" with "psoriasis (scaly white patches on his skin) on much of his body" and noting that Ivers did the cleaning, cooking, and shopping. (*Id.*, Ex. 1 at 6–7; *see also* Pl.'s Resp., Attach. 4 at 7.) Although Wolfson had no concerns with the condition of the apartment, she reported that Tallman "appeared to have significant dementia"; more specifically, he had "word finding difficulty," could only answer simple questions, was "not an accurate historian," needed "reminders to change his clothes and bathe," and was unaware that "he was passing flatulence as well as picking his nose and placing the nasal contents on the coffee table." (Wolfson Decl.,

Ex. 1 at 6–7; *see also* Pl.'s Resp., Attach. 4 at 4–5.) Wolfson did not document any

physical disabilities other than "some difficulty getting off the couch," "slightly unsteady

walking," and a recent incident of incontinence, which Tallman attributed to not being

able to "get to the bathroom in time" rather than a lack of mental awareness. (Wolfson

Decl., Ex. 1 at 6–7; *see also* Pl.'s Resp., Attach. 4 at 5.)

Wolfson concluded that Tallman suffered from dementia and diminished physical

functioning, and told Ivers that Tallman would have to be transported to a hospital for

nursing home placement if Ivers ever moved out. (Wolfson Decl., Ex. 1 at 7–8; Pl.'s

Resp., Attach. 4 at 32, 34.) On an assessment questionnaire, however, she checked "No"

beside the following statements:  "[t]he vulnerable adult does not or cannot meet his/her

current needs for safety and supervision, physical care, food, clothing, shelter, and/or

medical or mental health care," and "[t]he vulnerable adult demonstrates significant

mental/emotional distress or disorientation that suggests he/she is a danger to him/herself

or others." (Pl.'s Resp., Attach. 4 at 32, 35.)

Wolfson again visited Tallman's apartment on December 20, 2013, and again

found him to be "very quiet, calm, and very demented." (*Id.* at 8–9.) She reported that, at

one point during her visit, Tallman said that he did not know whether he smoked mere

moments after asking for cigarette, which prompted Ivers to explain that Tallman "used

to smoke and forgot that he quit smoking." (*Id.* at 9; *see also* Doc. No. 65, Ex. 6, Wolfson

Depo. 27–28.) That same day, Tallman signed a letter addressed to the owners of his

apartment building, complaining about the condition of his apartment, the status of his

attempts to renew his lease, and how he and Ivers had been treated by property

7

management. (Doc. No. 65, Long Decl., Ex. 1.) The letter stated, in relevant part, that Tallman was "70 years old," "very sickly, weak and frail," "too sick to have [his] apartment worked on," and was "handicapped and in bad condition." (*Id.* at 1–2.) Wolfson was convinced that Ivers wrote the letter because Tallman was "too demented" to do so and she recognized its wording as belonging to Ivers. (Pl.'s Resp., Attach. 4 at 10.) Ivers, by contrast, claims Tallman dictated the letter. (*Id.* at 32.)

Wolfson completed a final investigation report on February 4, 2014, finding that Tallman met "the functional definition of a vulnerable adult" due to cognitive impairments—namely, dementia—which undermined his ability to provide for himself and protect himself from harm. (Wolfson Decl., Ex. 1 at 11–12; Wolfson Depo. 13–16, 23–26.) She specifically noted that Tallman required "reminders to dress and bathe," had "a recent history of bowel and bladder incontinence because he can't get to the bathroom in time," and that Ivers "perform[ed] housecleaning, laundry, cooking, grocery shopping, and bill paying for George Tallman." (Wolfson Decl., Ex. 1 at 11.) Wolfson concluded that, if Ivers was unable to be at the apartment, Tallman would "require nursing home placement." (*Id.* at 12.) Her investigation, like her predecessor's, was inconclusive on the question of caregiver abuse or neglect. (*Id.* at 11-12; *see also* Pl.'s Resp., Attach. 3 at 14.)

Later that month, on February 14, 2014, Tallman applied for an additional $10,000 life insurance policy from CMFG, with Ivers as the named beneficiary. (Riehm Decl. ¶ 7 & Ex. 3 at 13–14.) Ivers admits that he filled out that application as well, though he again claims that he did so on Tallman's behalf and merely recorded Tallman's responses. (Pl.'s Depo. 35–37.) The application contained an identical agreement to the earlier one

signed by Tallman and similarly asked whether he was "currently unable to work because of injury or illness?" (Riehm Decl., Ex. 3 at 13.) Once again, Tallman's application indicated "No." (*Id.*) CMFG approved the application and issued a second life insurance policy for $10,000 on February 25, 2014. (*Id.* at 5.)

Tallman died less than two months later on April 20, 2014. (Doc. No. 65, Ex. 3.) A county medical examiner listed the immediate cause of death as natural causes, with a "history of dementia" serving as a "contributing condition[]."[2] (Riehm Decl., Ex. 1.) Officers with the Hopkins Police Department interviewed several people, including Ivers, immediately following the death. (*See* Doc. No. 65, Ex. 3.) According to police reports, Ivers indicated that he served as Tallman's caregiver for over two years, bathing him, cooking for him, and doing his laundry, because Tallman "was deteriorating with his physical health" and "needed help." (*Id.* at 3–4.) More specifically, Ivers informed the police that Tallman had psoriasis sores on his body, was "very slow in his movements and had an unsteady gait," and had to be "saved . . . several times from falling over as well as other accidents." (*Id.* at 4.) Officers also spoke with APS investigator Wolfson, Brentwood management and residents, and several of Tallman's family members, including his niece, all of whom indicated that Tallman exhibited signs of dementia. (*Id.* at 8–10.) The family members also noted a family history of dementia, including

---

[2]    It does not appear that the medical examiner conducted an autopsy or independently determined that Tallman suffered from dementia. According to one of the police reports in the record, the medical examiner apparently decided not to conduct "an autopsy because of [Tallman's] age and history of family dementia." (Doc. No. 65, Ex. 3 at 9.)

in Tallman's mother. (*Id.* at 10.)

Shortly after Tallman's death, Ivers submitted a claim to CMFG to recover the proceeds of the two life insurance policies. (*See* Doc. No. 65, Ex. 4 at 1.) Because Tallman died within the two-year contestability period, CMFG conducted a routine investigation, requested certain information from Ivers, and determined that "misrepresentations may have been made" on Tallman's insurance applications. (*See id.* at 1–5; *see also* Pl.'s Resp., Attach. 2 at 23–29.) On August 14, 2014, CMFG notified Ivers that it was unable to complete its investigation "for eligibility for coverage at the time of the [insurance applications]" due to "an insufficient release of medical information authorization." (Doc. No. 65, Ex. 4 at 4.) It therefore denied the insurance claim and refunded all premiums paid under the policies to Ivers. (*Id.*; *see also* Def.'s Counterclaim 6.)

Ivers then initiated this action in Minnesota state court, seeking to recover under Tallman's life insurance policies based on claims of breach of contract, promissory estoppel, equitable estoppel, and unjust enrichment. (Compl.) CMFG removed the case to federal court based on diversity jurisdiction and asserted a counterclaim for rescission of the policies based on alleged misrepresentations in the insurance applications concerning Tallman's health and ability to work. (*See* Doc. Nos. 1, 7.) The Court issued several scheduling orders, the last of which set deadlines of April 11, 2016, for completing fact discovery, April 25, 2016, for filing discovery and other non-dispositive motions, and May 23, 2016, for dispositive motions. (Doc. No. 44.) Following the close of discovery, Ivers filed two letters requesting summary judgment and asserting that CMFG had

"forfeited" its case by failing to answer his interrogatories, was "attempting to trick and stall the court," and was unsuccessfully "trying to build a fraud case against [him]." (Doc. Nos. 57, 59.) The Court collectively construed those filings as a motion for summary judgment. (Doc. No. 68.) CMFG filed its own motion for summary judgment, principally arguing that it is entitled to rescind the two life insurance policies under Minn. Stat. § 61A.11 because Tallman's applications contained willfully false or intentionally misleading statements that he was not unable to work due to illness or injury. (Doc. No. 60, Def.'s Mot. for Summ. J.; Doc. No. 62, Def.'s Mem. 1, 16–21.)

## II. DISCUSSION

### A.    Summary Judgment Standards

Summary judgment is appropriate if, "after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Johnson v. Carroll*, 658 F.3d 819, 825 (8th Cir. 2011) (quotation omitted). In ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A disputed fact is material when its resolution "might affect the outcome of the suit under the governing law," and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying "those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2001) (quotations omitted). If it does so, the non-moving party may not rest on mere allegations or denials, but must point to evidence of "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256; *see also* Fed. R. Civ. P. 56(c)(1). Conclusory assertions, standing alone, are not enough to create a genuine issue of material fact. *See Bennett v. Nucor Corp.*, 656 F.3d 802, 820 (8th Cir. 2011). Where the evidence "could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted).

**B.    CMFG's Motion for Summary Judgment**

**1. Breach of Contract and Rescission**

CMFG contends that Ivers cannot prevail on a breach-of-contract claim because it is entitled to rescind the life insurance policies due to material misrepresentations made in the insurance applications, specifically with respect to whether Tallman was unable to work due to illness or injury. (Def.'s Mem. 16–21.) Under Minnesota law, "insurers generally may rescind a policy if they discover material misrepresentations in the policy application," even in the absence of any intent to deceive. *PHL Variable Ins. Co. v. 2008 Christa Joseph Irrevocable Trust*, 782 F.3d 976, 980 (8th Cir. 2015); *see also Schmitt v. U.S. Fid. & Guar. Co.*, 210 N.W. 846, 849 (1976) ("We have held that, if a

12

misrepresentation is material, no intent to deceive need be shown."). But where a life

insurance policy is issued without a medical examination, as it was in this case, an insurer

can rescind the policy "based on an incorrect statement in the insurance application only

if the statement was willfully false or intentionally misleading." *Larson v. Nw. Mut. Life*

*Ins. Co.*, 855 N.W.2d 293, 298 (Minn. 2014). The relevant statute provides:

> In any claim upon a policy issued in this state without previous medical
> examination, . . . the statements made in the application as to the age,
> physical condition, and family history of the insured shall be valid and
> binding upon the company, unless willfully false or intentionally
> misleading.

Minn. Stat. § 61A.11.

The Minnesota Supreme Court has held that, for a statement to be willfully false

or intentionally misleading, it must be made with "intent to deceive," and an insurer

seeking to rescind a policy bears the burden of proving that intent. *Larson*, 855 N.W.2d at

299–300. An insurer may carry that burden by showing that a false statement was made

with "actual intent to deceive" or "by inference when the insured [or person completing

the application on his or her behalf] had knowledge of material facts and failed to

disclose those facts to the insurer."[3] *Id.* at 299. Whether misrepresentations on an

---

[3]     Although *Larson* framed the inquiry in terms of an insured's knowledge and
intent, courts have permitted rescission where someone other than the insured knowingly
made misrepresentations in the insurance application. *See Ellis v. Great-West Life
Assurance Co.*, 43 F.3d 382, 387–88 (8th Cir. 1994) (holding that rescission was
appropriate where the insured's husband, rather than the insured herself, knowingly
misrepresented his wife's medical history on her application). Minn. Stat. § 61A.11 states
only that "the statements made in the application" be "willfully false or intentional
misleading," regardless of who made those statements. For the purposes of determining

(Footnote Continued on Next Page)

13

insurance application have been made with such "fraudulent intent" is generally a question of fact to be resolved by a jury at trial. *Id.* at 300; *see also Hammer v. Investors Life. Ins. Co. of N. Am.*, 511 N.W.2d 6, 9 (Minn. 1994) (holding that it was "for the jury to determine" whether an applicant's misrepresentation was simply "inaccurate" or "willfully false or intentionally misleading"). The Minnesota Supreme Court has underscored that the question of intent may only be decided as a matter of law where "there is conclusive evidence in the record that the insured knowingly concealed material facts" — that is, where the "only reasonable inference from the insured's omission . . . is that he intended to deceive the insurance company." *Larson*, 855 N.W.2d at 300.

And where the alleged misrepresentation is elicited in response to a question that does not ask for "specific information from the applicant in regard to specific illness[es] or symptoms," but instead relies on "the applicant's own opinion" regarding his or her condition, the Minnesota Supreme Court has declined to allow a court to resolve the issue of intent as a matter of law, rather than by a jury as a matter of fact. *See Siemers v. United Benefit Life Ins. Co.*, 75 N.W.2d 605, 609 (Minn. 1956); *see also Larson*, 855 N.W.2d at 300 n.2. Indeed, in such circumstances, the Court appears to have imposed a heightened standard for proving the requisite intent, requiring that the false or misleading answer be "consciously made with a premeditated design" to falsify the facts so "as to lead the insurer to act when he otherwise would not." *Siemers*, 75 N.W.2d at 608; *see also Ellis v.*

---

(Footnote Continued from Previous Page)
the motions presently before the Court, the Court need not decide whose intent matters under the facts of this case — Tallman's, Ivers's, or both.

*Great-West Life Assur. Co.*, 43 F.3d 382, 386 (8th Cir. 1994) (explaining that Minnesota courts have required a showing of "'premeditated design' to falsify facts" where the pertinent application questions have not sought specific information regarding illnesses or symptoms).

The insurance application form asked whether Tallman was, at the time he signed the insurance applications in August 2013 and February 2014, unable to work because of any illness or injury. (Riehm Decl., Ex. 2 at 15 ("Has illness or injury caused you to retire, or are you currently unable to work because of injury or illness?").) Applicant's box was checked "No." (*Id.*) Accordingly, because the question did not ask for information regarding specific illnesses, symptoms, or abilities, but more generally asked for a conclusion about Tallman's ability to work, this Court cannot decide—as a matter of law— the issue of intent to deceive unless the evidence conclusively shows a subjective belief that Tallman was unable to work due to "illness or injury" yet Tallman (or Ivers) indicated to the contrary. *See Larson*, 855 N.W.2d at 300; *Siemers*, 75 N.W.2d at 609.

CMFG contends that it is "undisputed" that Tallman "had severely impaired cognitive function due to dementia" and was unable to work or "even carry out basic day-to-day tasks such as cleaning, cooking, dressing, and cleaning himself." (Def.'s Mem. 2, 6, 18.) Indeed, CMFG asserts that Ivers admitted in his deposition that "Tallman needed to be hoisted into the bathtub to wash himself," "would not have been able to work due to his physical condition," and "required either full-time in-home care or nursing home placement." (*Id.* at 6, 12 & n.4.) Ivers responds that no licensed physician ever diagnosed

15

Tallman with dementia, and that Tallman merely needed his help because he had "bad knees." (*See* Pl.'s Resp., Attach. 3 at 7, 33 & Attach. 4 at 4, 22, 24, 32, 52.) Ivers also argued at the summary-judgment hearing that while Tallman's knee problems would have prevented him from performing jobs that required significant walking or standing, he could work sitting down.

It is further disputed by Ivers that Tallman could not perform any job whatsoever, whether as a result of his bad knees or some other physical condition. In his deposition testimony, Ivers testified that he did not think Tallman could work, but then clarified, "Not a physical job." (Pl.'s Depo. 20, 24 ("Q. I understand he was retired. Say that he was not retired. Would it have been possible for him to work a job? A. Oh, well, I don't think so. Q. Okay. A. Not a physical job.").) Ivers does not concede that Tallman was totally unable to work due to his physical condition. Further, the deposition testimony before the Court shows that Ivers claims to have believed that Tallman "probably could have got by" without his daily assistance, though "it would have been tough." (Pl.'s Depo. 25, 71.)

Although APS investigators Listokin and Wolfson both classified Tallman as a vulnerable adult due to his alleged cognitive impairments, neither documented concern about his physical condition. Listokin's closing assessment found that he was able to communicate with others and "move about the home and community without assistance." (*See* Pl.'s Resp., Attach. 4 at 24–25, 28–29.) APS Investigator Wolfson also noted "some difficulty getting off the couch," "slightly unsteady walking," and incontinence, which Tallman attributed to not being able to get to the bathroom in time rather than a lack of

mental awareness. (*See* Wolfson Decl., Ex. 1 at 6–7; Pl.'s Resp., Attach 4 at 5.) Although

Wolfson ultimately concluded that Tallman required full-time care or nursing home

placement, that assessment was based on Tallman's alleged dementia, not any physical

limitations. (*See* Wolfson Decl., Ex. 1 at 11–12.) And, as noted, Tallman's cognitive

condition—and Tallman's and Ivers's understanding of Tallman's cognitive condition—

is a matter in dispute to be resolved by a jury at trial, not by a court on summary

judgment.

While the evidence strongly supports the conclusion that Tallman suffered from

dementia or some other severe cognitive impairment, it is not, as CMFG claims,

undisputed. In his deposition, Ivers specifically testified that Tallman's health problems

were limited to chronic psoriasis and "thrombosis or arthritis" in both knees. (Pl.'s Depo.

24–25.) Ivers gave similar statements to the police immediately following Tallman's

death, stating that Tallman "did not have any ailments aside from psoriasis" and a "very

slow" and "unsteady gait." (Doc. No. 65, Ex. 3 at 4, 7.) Ivers's deposition testimony, no

matter how self-serving, doubtful, or unsubstantiated by other evidence in the record, is

sufficient by itself to create a jury question as to whether Tallman suffered from an

illness that would have prevented him doing any type of work and, if so, whether

Tallman or Ivers intended to deceive when filling out the insurance forms. *See Stewart v.*

*Rise, Inc.*, 791 F.3d 849, 860 (8th Cir. 2015) ("Neither the absence of written reports nor

the self-serving nature of affidavits, interrogatory answers, or deposition testimony serve

to make such evidence inherently infirm. As such, we generally do not discount such

evidence at the summary judgment stage."); *Britton v. U.S.S. Great Lakes Fleet, Inc.*, 302

F.3d 812, 818 (8th Cir. 2002) ("[P]laintiff's testimony alone created a genuine issue of

material fact . . . ."); *Durukan Am., LLC v. Rain Trading, Inc.*, 787 F.3d 1161, 1164 (7th

Cir. 2015) ("In the summary judgment context, we long ago buried—or at least tried to

bury—the misconception that uncorroborated testimony from the non-movant cannot

prevent summary judgment because it is self-serving.") (quotation omitted). While

Ivers's testimony may find scant support in the record, it is not so incredible—so

blatantly contradicted by objective documentary evidence, blatantly inconsistent with

earlier sworn testimony, or so divorced from personal observation or the laws of nature—

that this Court may simply disregard it on summary judgment. *See Stewart*, 791 F.3d at

861.

      "At summary judgment, whether the movant's evidence is more persuasive than

the evidence of the non-movant is irrelevant. The only question is whether the evidence

presented, reasonably construed in the light most favorable to the non-movant, creates a

genuine dispute regarding any material fact precluding judgment as a matter of law."

*United States v. Funds in Amount of $100,120*, 730 F.3d 711, 717 (7th Cir. 2013). While

a jury may ultimately reject Ivers's version of the facts and thus infer that the insurance

applications were both false and made with intent to deceive, the evidence, when viewed

in the light most favorable to Ivers, does not conclusively establish that either he or

Tallman willfully lied when they indicated that Tallman was not unable to work due to

illness or injury. The question of intent to deceive should be left for a jury to decide. *See*

*Larson*, 855 N.W.2d at 300. This Court therefore recommends that CMFG's motion be

denied to the extent that it seeks summary judgment on its counterclaim for rescission and, by extension, Ivers's contract claim.

## 2. Promissory Estoppel, Equitable Estoppel, and Unjust Enrichment

Ivers's Complaint also asserts state law claims of promissory estoppel, equitable estoppel, and unjust enrichment based on CMFG's refusal to pay out on Tallman's life insurance policies. CMFG argues that it is entitled to summary judgment on those claims for myriad reasons, including that: (1) Ivers cannot rely on such equitable claims because this case arises under a written insurance contract; (2) any promise to pay out on the life insurance policies was made to Tallman, not Ivers, and was otherwise contingent on the insurance applications containing truthful information; (3) Ivers has not shown that he relied on any promises or representations made by CMFG to his detriment; (4) Ivers himself never conferred any benefit on CMFG because Tallman paid the insurance premiums; and (5) the premiums were otherwise refunded, so CMFG has not been unjustly enriched. (Def.'s Mem. 21–24.)

Ivers has not substantively responded to any of CMFG's arguments for summary judgment on his estoppel and unjust enrichment claims. He has therefore waived any such challenges and, for that reason alone, CMFG is entitled to summary judgment on those claims. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."); *Spice Corp. v. Foresight Mktg. Partners, Inc.*, No. 07-4767, 2011 WL 6740333, at *1 & n.1 (D. Minn. Dec. 22, 2011) (granting summary judgment on claims that the plaintiff failed to oppose). In any event, under Minnesota law, equitable claims of

promissory estoppel, equitable estoppel, and unjust enrichment are generally unavailable

when the rights of the parties are governed by an existing contract, as is the case here. *See*

*Watkins, Inc. v. Chilkoot Distrib., Inc.*, 719 F.3d 987, 994–95 (8th Cir. 2013); *U.S. Fire*

*Ins. Co. v. Minn. State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981) (explaining

that "equitable relief," including relief based on unjust enrichment, "cannot be granted

where the rights of the parties are governed by a valid contract"); *Greuling v. Wells*

*Fargo Home Mortg.*, 690 N.W.2d 757, 761 (Minn. Ct. App. 2005) ("Promissory estoppel

is an equitable doctrine that implies a contract in law where none exists in fact . . . . [A]n

express contract covering the same subject matter will preclude the application of

promissory estoppel."). And even if that were not the case, Ivers has not come close to

satisfying the elements of his estoppel or unjust enrichment claims. He has not, for

example, shown that CMFG made any misrepresentations, as required for equitable

estoppel; that he detrimentally relied on any promises or representations made by CMFG,

as required for promissory or equitable estoppel; or that he conferred a benefit on CMFG

that it has unjustly retained, as required for unjust enrichment. *See Park Nicollet Clinic v.*

*Hamann*, 808 N.W.2d 828, 834 (Minn. 2011); *Hauschildt v. Beckingham*, 686 N.W.2d

829, 838 (Minn. 2004); *Zinter v. Univ. of Minn.*, 799 N.W.2d 243, 247 (Minn. Ct. App.

2011). As CMFG notes, Tallman paid the premiums on the two insurance policies and it

refunded those payments to Ivers after denying coverage on the policies.[4]

---

[4]     In its reply memorandum in support of summary judgment, CMFG also asks the
Court to order Ivers to cease engaging in harassing conduct. (Doc. No. 73, Def.'s Reply 1
n.1.) CMFG notes, and the record shows, that Ivers has verbally harangued the defendant
(Footnote Continued on Next Page)

**C.**     **Ivers's Motion for Summary Judgment**

In his construed motion for summary judgment, Ivers contends that CMFG has "forfeited" its case by failing to answer his interrogatories, is attempting "to trick and stall the court," and is unsuccessfully "trying to build a fraud case against [him]." (Doc. Nos. 57, 59.) None of those assertions, however, provide a legitimate basis for a grant of summary judgment. First, the record does not establish that CMFG failed to respond to Ivers's interrogatories. (*See* Doc. No. 70, Long Decl., Ex. A.) CMFG responded to each of his interrogatories with answers or objections, as it was entitled to do. *See* Fed. R. Civ. P. 33(b) (providing that each interrogatory must either be answered or "objected to"). If Ivers felt that CMFG's answers were inadequate or its objections improper, his recourse was to file a timely motion to compel discovery. *See* Fed. R. Civ. P. 37. Ivers did not do so and his current dissatisfaction with CMFG's interrogatory responses is not a ground for summary judgment. *See* Fed. R. Civ. P. 56(a) (stating that summary judgment may only be granted if the moving party shows no genuine issues of material fact and entitlement to judgment as a matter of law with respect to actual claims

(Footnote Continued from Previous Page)
and its counsel in less than decorous terms, stating things like "pay me my f[- - -]ing money" and "F[---] you! You Lying F[---]ing Swindlers! F[---] you!" (*See* Doc. No. 70, Ex. E; Doc. No. 74, Ex. A.) Because CMFG has not formally moved for a restraining order, the Court will not consider its request at this time. *See* Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion."). The Court does, however, strongly advise Ivers to refrain from communicating with CMFG or its counsel in a harassing, vulgar, or unprofessional manner. *See Wells Fargo Bank, N.A. v. Clark*, No. 6:11-06248, 2012 WL 5400034, at *1 (D. Or. Nov. 2, 2012) (holding a *pro se* defendant in contempt "when, despite repeated warnings and instruction, [he] continued to communicate with plaintiff's counsel in a harassing, vulgar and threatening manner, and willfully ignored reasonable requests to conform his communications to a professional standard").

or defenses asserted in the litigation). Indeed, rendering judgment against a party for discovery abuses is generally not warranted unless and until the party has disobeyed a court order compelling discovery, which Ivers never sought or obtained. *See* Fed. R. Civ. P. 37(b). Ivers's allegations that CMFG is unsuccessfully trying to "build a fraud case" against him and "attempting to trick and stall the court" are also not cognizable grounds for summary judgment, nor is there any evidence that CMFG has engaged in deceitful or dilatory tactics. Because Ivers has neither argued nor shown that there are no genuine issues of material fact as to the merits of any claims or defenses raised in this action, his motion for summary judgment should be denied.

### III. CONCLUSION

In sum, this Court finds genuine issues of material fact as to whether Tallman or Ivers acted with the requisite intent to deceive CMFG when they indicated that Tallman was not unable to work due to illness or injury, such that CMFG would be entitled to rescind the life insurance policies. Given those disputed issues of fact, which include whether Tallman suffered from dementia, whether he was totally unable to work, and whether any misrepresentations on the insurance applications were made with a subjective intent to deceive, CMFG's motion for summary judgment should be denied as to the parties' competing claims for breach of contract and rescission. This Court does recommend, however, that CMFG be granted summary judgment on Ivers's remaining claims of promissory estoppel, equitable estoppel, and unjust enrichment.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff Robert Ivers's construed motion for summary judgment (Doc. Nos. 57, 59) be **DENIED**.

2.      Defendant CMFG Life Insurance Company's motion for summary judgment (Doc. No. 60) be **GRANTED IN PART** and **DENIED IN PART**. The motion should be denied as to Ivers's claim for breach of contract and CMFG's claim for rescission, but granted as to Ivers's remaining claims for promissory estoppel, equitable estoppel, and unjust enrichment.

3.      Ivers's claims for promissory estoppel, equitable estoppel, and unjust enrichment be **DISMISSED WITH PREJUDICE**. The only claim that would remain is Ivers's claim for breach of contract.

Date:  August 12, 2016

                                        *s/ Becky R. Thorson*
                                        BECKY R. THORSON
                                        United States Magistrate Judge

## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report by **August 26, 2016**. A party may respond to those objections within **fourteen days** after

service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within **ten days** of receipt of the Report.