UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Robert Ivers,                                   Case No: 15-cv-1577 (WMW/BRT)

       Plaintiff,

   v.                                          **FINDINGS OF FACT,
CONCLUSIONS OF LAW AND
ORDER FOR JUDGMENT**

CMFG Life Insurance Company,
d/b/a CUNA Mutual Group,

       Defendant.

---

Plaintiff Robert Ivers filed this breach-of-contract lawsuit against Defendant CMFG Life Insurance Company, d/b/a CUNA Mutual Group (CMFG), seeking to recover $100,000 as the named beneficiary of two life insurance policies that CMFG issued to decedent George Tallman III. CMFG filed a counterclaim to rescind the two life insurance policies, alleging that Tallman's applications contained willfully false or intentionally misleading representations as to Tallman's health and ability to work.[1] The Court held a bench trial on this matter in January 2017.[2] Proposed findings of facts and conclusions of law subsequently were submitted by the parties. The Court now issues the

---

[1]     Ivers voluntarily dismissed his claims for breach of the duty of good faith and fair dealing, punitive damages and attorneys' fees. (Dkt. 21.) The Court granted summary judgment in favor of CMFG as to Ivers's equitable claims for estoppel and unjust enrichment. (Dkt. 81.)

[2]     Because neither party filed a timely demand for a jury trial, this matter was tried to the Court. (Dkt. 87.)

following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT[3]

**I.    Application for and Issuance of the Disputed Life Insurance Policies**

1.    CMFG received an application (Application 1) for a term life insurance policy signed by George Tallman III on August 24, 2013.  (CMFG Ex. 1 at 12.[4])

2.    Application 1 indicates that Tallman was a 68-year-old non-smoker and identified his occupation as "retired."  (CMFG Ex. 1 at 11.)  Application 1 names "Robert Philip Ivers" as the beneficiary of any policy issued and describes Ivers's relationship to Tallman as "friend."  (*Id.*)

3.    Application 1 includes responses to several background questions.  (CMFG Ex. 1 at 11-12.)  As relevant here, question number 8 in Application 1 asks whether Tallman is "currently unable to work because of any illness or injury."  (*Id.* at 12.)  The response provided to this question is "No."  (*Id.*)

4.    On September 10, 2013, Tallman was informed by letter that CMFG had accepted Application 1 for term life insurance.  (CMFG Ex. 1 at 1.)  The acceptance letter

---

[3]    The Court includes citations to the record throughout these findings of fact.  The trial transcript is cited at Dkt. 101 and Dkt. 102, and exhibits are identified by "Ex."  The Court cites to Bates numbers when available and otherwise uses natural pagination.

[4]    The parties stipulated to the admissibility of all of CMFG's trial exhibits with the exception of certain deposition transcripts.  (Dkt. 102 at 225:11-16.)

enclosed Policy No. NJ7892177 (Policy 1), which became effective on September 9, 2013. (*Id.*) The "face amount" of Policy 1 is $90,000. (*Id.* at 2.)

5.      CMFG received a second application (Application 2) for a term life insurance policy signed by Tallman on February 14, 2014. (CMFG Ex. 2 at 10.)

6.      Application 2 provides Tallman's age as 69 years old and names "Robert P. Ivers" as the beneficiary of any issued policy. (CMFG Ex. 2 at 9.) Application 2 describes Ivers's relationship to Tallman as "friend." (*Id.*)

7.      Similar to Application 1, Application 2 poses several background questions. (CMFG Ex. 2 at 9.) As relevant here, question number 1 in Application 2 inquires whether any "illness or injury caused you to retire, or are you currently unable to work because of injury or illness." (*Id.*) The response in Application 2 to question number 1 is "No." (*Id.*)

8.      In February 2014, CMFG accepted Application 2 and issued Tallman Policy No. NJ7978554 (Policy 2). (CMFG Ex. 2 at 1.) Policy 2 became effective on February 25, 2014. (*Id.*) The "face amount" of Policy 2 is $10,000. (*Id.*)

9.      Both Application 1 and Application 2 contain the following provision:

> AGREEMENT: All my statements and answers are true to the best of my knowledge and belief. This application will be the basis of any insurance issued. I understand that: (1) benefits may be denied during the first 2 years from the effective date if I fail to give true and complete answers in this application . . . ; and (2) this insurance becomes effective only if . . . the answers to questions concerning my insurability are as stated in this application.

(CMFG Ex. 1 at 12; CMFG Ex. 2 at 10.)

3

10.     Both Policy 1 and Policy 2 (the policies) limit CMFG's right to contest the issuance of the policies within two years of their effective dates, except for "failure to pay premiums or fraud" or "on the basis of any material misrepresentation in the application[s]. . . signed by you."  (CMFG Ex. 1 at 8; CMFG Ex. 2 at 7.)

11.     At trial, CMFG staff underwriter Rebecca Riehm testified and explained that CMFG underwriters "review applications for life insurance."  (Dkt. 102 at 340:8-341:8.)

12.     Riehm confirmed that CMFG issued the policies to Tallman based on the responses that CMFG received to the questions posed in Application 1 and Application 2.  (*Id.* at 343:8-18.)

13.     Riehm explained that—with respect to question number 8 in Application 1 and question number 1 in Application 2 regarding impairments to an applicant's ability to work—the "purpose of that particular question is . . . to know what kind of limitations [an applicant] might have . . . because that would impact [the applicant's] ability to take out an insurance policy . . . . So if [an applicant] answer[s] 'Yes' to that question . . . we would actually call out and do a personal history interview with [the applicant] . . . and ask for additional details."  (*Id.* at 345:16-346:12.)

14.     Riehm explained that relevant "limitations" could include whether applicants "need to use a walker, do they need to use a wheelchair.  Activities of daily living [are] considered," such as whether applicants "need help getting dressed . . . going to the bathroom . . . help cooking or cleaning within [their] home."  (*Id.* at 346:21-347:6.)

4

15.     Whether an applicant has a caregiver, according to Riehm, is material to CMFG's decision to issue life insurance "because if someone has limited functionality due to mental and/or physical impairments, then that does increase their mortality and we would not offer insurance to someone who would have a caregiver." (*Id.* at 347:11-21.)

16.     Because of the responses included in Application 1 and Application 2, Riehm testified, CMFG did not conduct an investigation into Tallman's health history. (*Id.* at 345:12-346:20; 348:2-14.)

## II.    Tallman's Physical and Cognitive Functioning

17.     Tallman resided at Brentwood Park Apartments (Brentwood) in Hopkins, Minnesota, at all times relevant to this dispute. (CMFG Ex. 6 at CMFG0117.) Ivers moved in with Tallman in September 2011 because, according to Ivers, Tallman's physical condition was deteriorating and because Tallman asked Ivers to live with him. (CMFG Ex. 11 at 4.) Ivers thereafter held himself out as Tallman's caregiver, taking responsibility for Tallman by cooking, cleaning, grocery shopping and delivering rent checks for Tallman. (CMFG Ex. 6 at CMFG0119; Dkt. 101 at 148:1-5.) According to Ivers, Tallman paid nearly all of their living expenses during the time in which Ivers cared for Tallman.[5] (CMFG Ex. 14 at 46:12-47:23.) Ivers lived with Tallman until Tallman's death on April 20, 2014. (CMFG Ex. 11 at 3-4; CMFG Ex. 12.)

---

[5]     The Court admitted into evidence the February 18, 2016 deposition testimony of Plaintiff Robert Ivers. Fed. R. Civ. P. 32(a)(3). (Dkt. 102 at 225:17-22.)

18.     Twice in 2013, Michael Mumaw, Brentwood's property manager at the time, noticed Tallman "sitting on the steps" in a Brentwood common area having "completely soiled himself." (Dkt. 101 at 152:21-23.) The two interactions were substantially identical. (*Id.* at 153:12-13.) Mumaw approached Tallman and asked if he was "okay." (*Id.* at 152:23.) Tallman did not react. Rather, he "looked distant and like he had no idea who [Mumaw] was. He didn't say anything. He did not acknowledge [Mumaw's] existence. He just sat there staring at his feet." (Dkt. 101 at 153:19-154:3.) Following his encounters with Tallman on the stairs, Mumaw contacted Hennepin County Adult Protective Services (APS).[6] (*Id.* at 154:5-6.)

19.     According to APS records,[7] APS first received a report about Tallman on May 16, 2013. (CMFG Ex. 7 at CMFG0003, CMFG0009.) Margaret A. Keating's intake notes state that Tallman "had a bowel movement and was not able to get to the toilet" and describe Tallman as "skin and bones" and "very scaley [sic] from not being clean." (CMFG Ex. 7 at CMFG0003.) On May 21, 2013, APS assigned the matter to Senior Social Worker Monica Listokin "to investigate . . . allegations of caregiver neglect

---

[6]     CMFG also introduced evidence of other instances in which the Hopkins Police Department interacted with Ivers, both related and unrelated to Ivers's care of Tallman. These interactions, however, are largely irrelevant to either Ivers's claim for breach of contract or CMFG's claim to rescind Tallman's life insurance policy.

[7]     Several APS records refer to "VA," which is an abbreviation for "vulnerable adult." (Dkt. 102 at 240:18-23.) Here, references in the records to "VA" refer to Tallman. (*Id.*)

and financial exploitation." (CMFG Ex. 7 at CMFG0003, CMFG0009; Dkt. 101 at 179:5-14.)[8]

20.     As an investigator for APS, Listokin "would receive reports that needed an investigation by a person actually going out and seeing people and determining if somebody was a vulnerable adult; and then if they were a vulnerable adult, if there was an issue of self-neglect or abuse or maltreatment by another person or financial exploitation." (Dkt. 101 at 175:10-17.)

21.     According to Listokin's report, APS commenced its investigation on allegations that Tallman was "not being cared for properly" because Tallman did not bathe, smelled bad, and was bleeding from open sores. (CMFG Ex. 7 at CMFG0009; Dkt. 182:20-24.) According to Listokin, the underlying concerns were that "Tallman was impaired [and] might have dementia," and that "Tallman wasn't receiving food." (Dkt. 101 at 182:6-19.)

22.     Listokin began her investigation by collecting background information about Tallman and his living situation. (CMFG Ex. 7 at CMFG0009.) Listokin learned that Tallman was "known to be forgetful" and that Ivers moved in with Tallman "to take care of George, clean his apartment, do the cooking, and help him with other activities of daily living." (*Id.*)

---

[8]     The record contains APS "intake" forms that indicate Tallman had cognitive impairments and "dementia." (*See, e.g.*, CMFG Tr. Ex. 7 at CMFG0026, CMFG0030.) At trial, however, CMFG failed to provide foundation for the information contained in these intake forms. (Dkt. 102 at 242:3-20, 305:19-307:13.) For this reason, the Court does not rely on the intake forms as reliable information regarding Tallman's condition.

23.    On May 22, 2013, Listokin conducted a home visit at Tallman's Brentwood apartment to "assess George Tallman's medical situation." (CMFG Ex. 7 at CMFG0010; Dkt. 101 at 181:19-23; 185:4-10.)    APS resident physician Dr. John Mayerhoffer accompanied Listokin to Tallman's apartment.    (CMFG Ex. 7 at CMFG0010.)  Listokin found the apartment to be "tidy" and with "no odor." (CMFG Ex. 7 at CMFG0010; Dkt. 101 at 197:9-16.)   The apartment also contained "boxes of food neatly stacked in the kitchen." (CMFG Ex. 7 at CMFG0010.)

24.    Listokin reported that Tallman was tall and slender, dressed in a sports coat and jeans and "appeared to have significant scaliness on his forearm." (CMFG Ex. 7 at CMFG0010.)  Dr. Mayerhoffer noted psoriasis sores on Tallman's legs, arms and back. (*Id.*)   Tallman "stated he had been to a skin doctor less than a year [prior to Dr. Mayerhoffer's exam], and no one can help him with his skin problems, so he is not interested in seeing any other doctors."   (*Id.*; Dkt. 101 at 187:6-10.)    Listokin characterized Tallman as fluctuating between "hostility at Dr. Mayerhoffer for asking him questions, and dull listlessness staring at the TV set." (CMFG Ex. 7 at CMFG0010.)

25.    As a result of the home visit, Listokin concluded that Ivers "was the caregiver for Mr. Tallman," (Dkt. 101 at 187:14-21), and that "the conditions of both the apartment and Mr. Tallman were less dire than had been presented, and there is nothing that rises to the level of forcing Mr. Tallman into an alternative setting or situation," (CMFG Ex. 7 at CMFG0010-11).

26.  Listokin conducted a follow-up visit at Tallman's apartment on June 4, 2013.  (*Id.* at CMFG0011; Dkt. 188:12-16.)  Listokin reported that the apartment was in good condition and characterized Tallman as "not highly communicative" but displaying "flashes of humor."  (CMFG Ex. 7 at CMFG0011.)  Tallman told Listokin that he was "content" and "does not want to see any doctors for his psoriasis."  (*Id.*)  Tallman also stated that he enjoyed the company of Ivers.  (*Id.*)  Tallman believed he was well cared for and wished to be left alone.  (*Id.*)

27.  Listokin issued a "Report of Investigation and Protective Plan" on June 18, 2013.  (CMFG Ex. 7 at CMFG0012.)  Listokin classified Tallman as a vulnerable adult, pursuant to Minn. Stat. § 626.5572, subd. 21(4)(i)-(ii), because Tallman's "mental infirmities" impaired his ability to "provide adequately for [his] own care without assistance (housing, food, clothing, medical care, medication management, money management, supervision) and impair[ed] his ability to protect [himself] from maltreatment."  (*Id.* at CMFG0011; Dkt. 101 at 190:24-191:14.)  Listokin credibly testified that she determined Tallman was a vulnerable adult "because of everything about his demeanor and ability to care for himself, that he needed assistance in making sure that he had food, that bills got paid.  He did not appear to be able to do that on his own."  (Dkt. 101 at 189:8-14.)

28.  Listokin also concluded that Tallman "need[ed] assistance, prompting, and/or special arrangements" to safely navigate the community, (CMFG Ex. 7 at

CMFG0020), and noted "[s]ome concerns related to [Tallman's] cognitive functioning and/or occasional disorientation," (*Id.* at CMFG0061; Dkt. 101 at 214:7-15).[9]

29.    In a document titled "Strengths & Needs Assessment/Reassessment," Listokin indicated that she had "some concerns related to [Tallman's] cognitive functioning and/or occasional disorientation," (CMFG Ex. 7 at CMFG0061), but no concerns as to Tallman's physical health, medical care coverage, or "mental health/coping skills." (*Id.*; Dkt. 101 at 207:10-209:11.)

30.    Listokin distinguished between "cognitive impairment" and "mental health coping skills" as those terms are used in the "Strengths & Needs Assessment/Reassessment." (Dkt. 101 at 220:23-221:7.)    According to Listokin, "cognitive functioning is specifically . . . some kind of cognitive impairment, whether it's through a lower IQ or dementia or [another] kind of dysfunction" whereas "mental health coping skills has to do with if it looks like the person has symptoms of mental illness that are impeding their ability to function, so schizophrenia or major depression, something along [those] lines." (*Id.*)

31.    In her final assessment, Listokin noted that Tallman had lived in his apartment for 38 years, regularly paid his rent and had no outstanding bills. (CMFG Ex. 7 at CMFG0011.)  Although Tallman displayed "memory deficits," Tallman reported to

---

[9]    Listokin qualified her assessment of Tallman's cognitive functioning as a "general impression" and admitted that she is "not in a position to make a diagnosis in terms of . . . dementia . . . [or] some specific cognitive impairment." (Dkt. 101 at 189:15-19; 199:2-10.)

Listokin that he "relie[d] on Bob Ivers to take care of him." (*Id.* at CMFG0012.) Ivers's caretaking included managing Tallman's finances, cooking, shopping, cleaning and bathing. (*Id.*) Tallman disclaimed any interest in receiving medical care, (Dkt. 101 at 214:21-215:9), and indicated that he was content with Ivers as his caretaker, (CMFG Ex. 7 at CMFG0012). Listokin reported the outcome of her investigation of the allegations of caretaker maltreatment as "inconclusive." (*Id.* at CMFG0012.)

32.     Listokin completed her APS investigation on June 18, 2013. (CMFG Ex. 7 at CMFG0012.) Just over two months later, on August 24, 2013, Tallman submitted Application 1 to CMFG for $90,000 in life insurance and averred that he was not unable to work because of any illness or injury. (CMFG Ex. 1 at 12.) Ivers testified that, to complete Application 1, he asked Tallman each question and checked the response that Tallman instructed. (Dkt. 101 at 89:17-90:9.)

33.     Contrary to the responses included in Application 1, the overwhelming evidence establishes that as of August 24, 2013, the date on which Tallman signed Application 1, Tallman was unable to work because of an illness or injury. Tallman was unable to care for himself, was classified as a vulnerable adult, and essentially required fulltime care.

34.     In December 2013, APS field investigator Amy Wolfson initiated a second investigation into Tallman's circumstances after APS received reports that Tallman "smells like he has not bathed in over a month" and "you can 'smell him' (referring to [Tallman]) the minute you come in the building. It is an 8 unit apartment complex."

(CMFG Ex. 7 at CMFG0117; Dkt 102 at 230:12-13, 234:12-236:7.)    Wolfson also learned that Tallman had "soiled the carpet of the hallway."  (Dkt. 102 at 237:8-10.[10]) Wolfson testified that she "always [is] skeptical" of reports APS receives and that APS conducts investigations because it "need[s] specifics."  (*Id.* at 242:3-13.)

35.    Wolfson made an unannounced home visit to Tallman's apartment on December 6, 2013.  (CMFG Ex. 7 at CMFG0118; Dkt. 102 at 239:2-3.)    Wolfson reported that Tallman was "very thin" and suffered from "psoriasis . . . on much of his body."  (CMFG Ex. 7 at CMFG0118.)  Tallman also "had some difficulty getting off the couch and was slightly unsteady walking."  (*Id.* at CMFG0118-19.)  Ivers told Wolfson that he did practically everything for Tallman, (Dkt. 102 at 246:20-24), and that Tallman required reminders to bathe, (Dkt. 102 at 251:3-16).

36.    Ivers and Tallman also discussed Tallman's reported incontinence with Wolfson.  (CMFG Ex. 7 at CMFG 0119.)  Ivers observed that Tallman's incontinence had only recently become a problem, and Tallman reported that he was aware when he needed to use the bathroom, but the incontinence episode was because he could not get to the bathroom in time.  (*Id.*; Dkt. 102 at 253:6-20.)  Ivers told Wolfson that Tallman would need to find nursing-home placement if the incontinence continued.  (CMFG Ex. 7 at CMFG0119.)

---

[10]    The record is unclear as to whether a third episode of incontinence occurred prior to Wolfson's investigation or whether the incontinence that concerned Wolfson was the second episode to which Mumaw referred during his testimony.  *See* ¶ 18, *supra*.

37.    Based on Wolfson's conversations with Ivers and Tallman, Wolfson reported that Tallman required "reminders to change his clothes and bathe," and that Ivers "cleans, shops, and cooks for George Tallman."  (*Id.* at CMFG0019; Dkt. 252:7-13, 253:21-25.)   Wolfson also reported that Tallman "appeared to have significant dementia."[11]  (CMFG Ex. 7 at CMFG0118.)  Wolfson testified that Tallman "couldn't really answer many questions about his abilities to take care of himself or what was going on at the house."  (Dkt. 102 at 243:20-244:3.)  In addition, Tallman could not recall family members or recall anyone that Wolfson could contact for background information. (*Id.* at 244:17-24.)  Wolfson reported that Tallman "had word finding difficulty, could only answer simple questions, and was not an accurate historian.  [Tallman] appeared to be unaware of social graces – he was passing flatulence as well as picking his nose and placing the nasal contents on the coffee table."  (CMFG Ex. 7 at CMFG0118; Dkt. 102 at 244:24-245:8.)

38.    Tallman reported to Wolfson that he had no concerns and wanted to remain in his apartment.  (CMFG Ex. 7 at CMFG0119; Dkt. 102 at 246:3-10, 250:10-20.) Wolfson observed, however, that Ivers had several concerns with Tallman's situation. (CMFG Ex. 7 at CMFG0119; Dkt. 246:3-10.)  Specifically, according to Wolfson's report, Ivers "was upset at the accusations against both him and George" and "stated George deserved respect being a long-term resident."  (CMFG Ex. 7 at CMFG0119.)

---

[11]    Wolfson explained that she used the word "dementia" to mean "cognitive impairment."  (Dkt. 102 at 245:9-18.)  It is undisputed that neither Listokin nor Wolfson is qualified to offer a medical diagnosis.

13

Ivers told Wolfson that the Brentwood staff overreacted to the situation and that other residents have mental-health or chemical-health issues. (*Id.*)

39.    According to her report, Wolfson informed Brentwood at the conclusion of the December 6, 2013 visit that "Tallman is demented and can't be alone," and if Ivers is removed from the situation "Tallman needs to be transported to the hospital for nursing home placement." (CMFG Ex. 7 at CMFG0119-20; Dkt. 102 at 250:21-251:10.)

40.    Following the December 6, 2013 visit, Wolfson contacted Tallman's niece who confirmed that Tallman "has cognitive impairment" and "requires nursing home level of care." (CMFG Ex. 7 at CMFG0120.)

41.    On December 10, 2013, Wolfson received a phone call from Ivers reporting that Tallman "was given a lease renewal reminder." (*Id.*)  Ivers requested that Brentwood staff meet Tallman in Tallman's apartment due to Tallman's limited ambulation and cognitive impairment. (*Id.*)  Wolfson concurred with Ivers's assessment that Tallman could not walk to the leasing office which was fewer than two blocks from Tallman's Brentwood apartment. (Dkt. 102 at 248:6-247:2.)  The Brentwood staff told Ivers that Tallman's lease may not be renewed "depending on what Adult Protection determines." (CMFG Ex. 7 at CMFG0120; Dkt. 257:10-258:13.)

42.    On December 20, 2013, Wolfson returned to Brentwood in an effort to address the lease-renewal determination and made an unannounced visit to Tallman's apartment. (CMFG Ex. 7 at CMFG0120.)  Wolfson reported that Tallman's situation appeared "the same as the previous visit," and remarked that Tallman appeared "quiet,

calm, and very demented." (*Id.* at CMFG0120-21; Dkt. 102 at 259:5-21.) During the visit, Tallman asked Wolfson for a cigarette. Ivers explained to Wolfson that Tallman used to smoke and forgot that he quit smoking. (CMFG Ex. 7 at CMFG0121; Dkt. 102 at 260:15-23.)

43. Wolfson inquired about the lease and, according to Wolfson's report, Tallman clearly expressed that "he did NOT want to move and wanted to remain [in] his apartment." (CMFG Ex. 7 at CMFG0121.) Wolfson learned that Brentwood management was assessing whether to renew the lease. If Brentwood declined to renew the lease, Tallman would have to move within 60 days. (*Id.*) Wolfson informed the Hopkins Police Department of the circumstances, including that "George Tallman [could not] be alone and needs to be transported to the hospital for nursing home placement." (*Id.*)

44. In a letter dated December 20, 2013—the same date that Wolfson visited Tallman to assist in the lease-renewal determination—Tallman ostensibly signed a letter to Brentwood addressing his lease renewal. (CMFG Ex. 7 at CMFG0104-05.) The letter details ways in which Tallman's apartment was allegedly "falling apart" and demands a rent reduction because Tallman is "too sick to have [his] apartment worked on." (*Id.* at CMFG0104.) The letter describes Tallman's condition as "very sickly, weak and frail" and "handicapped and in bad condition." (*Id.* at CMFG0104-05.) Wolfson was copied on the letter. (*Id.* at CMFG0105.)

45.    Wolfson believes that the letter was "really written by Robert Ivers," (CMFG Ex. 6 at CMFG0122), because Tallman "was too cognitively impaired to write that" and "some of the wording was Bob, how he talked." (Dkt. 102 at 264:19-24, 265:11-25.) Wolfson admitted at trial that it was possible Tallman could have dictated this letter and had a secretary type it up. (Dkt. 102 at 314:4-9.)

46.    But during Wolfson's December 6, 2013 visit to Tallman's apartment, Tallman informed Wolfson that he had no concerns about his living arrangement. (CMFG Ex. 7 at CMFG0119). Ivers, however, offered several complaints. (*Id*.) Many of Ivers's complaints appear in the December 20, 2013 letter to Brentwood. Based on APS's characterization of Tallman's cognitive condition and the similarities between Ivers's complaints and the contents of the December 20, 2013 letter, the Court finds that Ivers authored the December 20, 2013 letter to Brentwood.

47.    On January 8, 2014, Wolfson attended a meeting between Tallman, Ivers and Brentwood management at Tallman's apartment. (CMFG Ex. 6 at CMFG0122.) Brentwood management decided to renew Tallman's lease. (*Id.*) Wolfson confirmed with Brentwood management that it would arrange for Tallman to be "transported to the ER for placement should Robert Ivers ever be removed from the property." (*Id.*)

48.    Wolfson submitted her "Report of Investigation and Protective Plan" regarding Tallman on February 4, 2014. (CMFG Ex. 6 at CMFG0125.) Similar to Listokin's report, Wolfson classified Tallman as a vulnerable adult who suffered from "cognitive impairment" requiring "reminders to dress and bathe." (*Id.* at CMFG0122-23;

16

Dkt. 102 at 262:4-18.)    Because of Tallman's cognitive impairments, Wolfson

determined that Tallman "has an impaired ability to identify harm and protect himself."

(CMFG Ex. 6 at CMFG0123-24.)    Wolfson noted Tallman's recent history of

incontinence and found that Ivers "performs housecleaning, laundry, cooking, grocery

shopping, and bill paying for George Tallman."    (CMFG Ex. 6 at CMFG0123-24.)

Wolfson testified that, based on her observations and Ivers's statements, Ivers was

Tallman's "caregiver."    (Dkt. 102 at 266:1-24.)    In Wolfson's professional opinion,

Tallman's condition rendered him unable to hold even a menial job.  (Dkt. 102 at 333:8-

10.)

     49.    Wolfson also completed a "Strengths & Needs Assessment/Reassessment,"

in which Wolfson indicated that she had "significant concerns related to [Tallman's]

cognitive functioning and/or chronic disorientation," but no concerns as to Tallman's

physical health or "mental health/coping skills."  (CMFG Ex. 7 at CMFG0042.)

     50.    In Wolfson's "final disposition" report, she determined that the allegations

that Ivers emotionally abused or neglected Tallman were inconclusive.  (CMFG Ex. 7 at

CMFG0123; Dkt. 102 at 263:10-23.)    Wolfson found that "Tallman's dementia [was]

such that he would not remember" emotional abuse.  (CMFG Ex. 7 at CMFG0123.)

Wolfson also concluded that allegations of self-neglect as to Tallman were

"inconclusive." (*Id.* at CMFG0124.)  Although Tallman "is cognitively impaired . . . he

allows assistance from Robert Ivers." (*Id.*)  Wolfson ultimately concluded that Tallman

would require immediate nursing-home placement if Ivers left the apartment because,

"[d]ue to the degree of cognitive impairment, George Tallman does not appear appropriate for assisted living placement."  (*Id*; Dkt. 102 at 324:12-325:4.)

51.    On February 14, 2014, ten days after Wolfson completed her report, Tallman signed Application 2 for $10,000 in life insurance from CMFG and averred that he was not unable to work because of any illness or injury.  (CMFG Ex. 2 at 9-10.)  Ivers testified that he assisted Tallman with completing Application 2 by asking each question and then checking the response as Tallman instructed.  (Dkt. 101 at 89:17-90:9.)

52.    The overwhelming evidence establishes that on February 14, 2014, the date on which Tallman signed Application 2, Tallman was unable to work because of an illness or injury.  Tallman was unable to care for himself, was classified as a vulnerable adult, and required fulltime care.

53.    Tallman died in his Brentwood apartment on April 20, 2014, fewer than ten weeks after signing Application 2.  (CMFG Ex. 12; CMFG Ex. 11 at 3-12.)

54.    The Hopkins Police Department interviewed several people following Tallman's death.  (CMFG Ex. 11 at 3-12.)  Ivers told the police that Tallman did not take any medications, did not have a doctor, and did not have any ailments aside from psoriasis of the skin.  (*Id.* at 5.)  He later explained that Tallman had several sores on his body.  (*Id.*)  Ivers also explained that Tallman was very weak and moved around like he was a 90-year-old man.  (*Id.* at 8.)  Ivers reported that he saved Tallman several times from falling over and from other accidents.  (*Id.* at 5.)

55.    Ivers has made several statements, including at his deposition and during his trial testimony, about Tallman's mental and physical condition for the time period that is relevant to this dispute.  These statements are strikingly inconsistent.[12]  The Court relies predominately on Ivers's statements that preceded this litigation and that are corroborated by other evidence.   All other statements by Ivers about Tallman's condition lack credibility.

56.    Wolfson provided the Hopkins Police Department with background information about APS's investigation to determine whether Tallman required protective services.  (*Id.* at 9.)  According to the police report, Wolfson reported that Tallman was "coherent and refused to seek medical treatment," but Wolfson also suspected that Tallman suffered from "undiagnosed [d]ementia" and "could not be alone."  (*Id.* at 9-10.)  The Hopkins Police Department also interviewed Tallman's niece, who told police that, although she had not seen Tallman in almost nine years, on that occasion, Tallman showed signs of dementia, which she told police is in the family history.  (*Id.* at 10-11.)

57.    Tallman's death certificate identifies the immediate cause of death as "natural causes" and includes Tallman's "history of dementia" as a condition contributing to his death.  (CMFG Ex. 12.)

---

[12]    For example, Ivers testified at trial that classifying Tallman as "extremely limited" was an unfair characterization of Tallman's condition.  (Dkt. 101 at 74:5-9.)  His deposition testimony stated the opposite.  (CMFG Tr. Ex. 14 at 23:7-14.)  At trial, CMFG impeached Ivers's testimony by identifying various inconsistencies between his trial testimony and his deposition testimony.  (Dkt. 101 at 75:5-89:4.)

### III.    Ivers Submits a Claim as the Beneficiary of the Policies

58.    Shortly after Tallman's death, Ivers submitted a claim to CMFG as the beneficiary of Policy 1 and Policy 2.

59.    Because of the effective dates of Policy 1 and Policy 2, September 9, 2013 and February 25, 2014, respectively, it is undisputed that Tallman's death on April 20, 2014, was within the two-year contestability period of both insurance policies.

60.    On May 13, 2014, CMFG sent Ivers a letter stating that "[w]henever a claim is received within two years from the date a policy is issued, it is our practice to review the insured's health at the time the policy was issued."  (CMFG Ex. 21 at 37.) CMFG directed Ivers to submit a copy of Tallman's death certificate, complete various questionnaires about Tallman's health history and sign authorizations for CMFG to complete a review of Tallman's medical records.  (*Id.*)

61.    On June 6, 2014, CMFG sent a letter to Ivers advising him that CMFG had "not received the requested information" to review Ivers's claim.  (CMFG Ex. 21 at 38.) CMFG informed Ivers that it "required [this] information for establishing proof of loss." (*Id.*)

62.    On August 1, 2014, CMFG sent Ivers another letter, nearly identical to the June 6, 2014 letter, which restated CMFG's request for information.  (CMFG Ex. 21 at 39.)

63.    On August 14, 2014, CMFG sent Ivers a letter informing him that "death proceeds are not available at this time" because CMFG could not complete its

investigation into Tallman's eligibility for coverage.  The letter advised Ivers that CMFG would return to him "all premiums paid" on Policy 1 and Policy 2.  (CMFG Ex. 21 at 40.)

64.    On February 24, 2015, Ivers filed this action in Minnesota state court. (Dkt. 1-1.)

65.    CMFG timely removed the matter to this Court.  (Dkt. 1.)

## CONCLUSIONS OF LAW

1.    Ivers asserts a breach-of-contract claim against CMFG alleging that it failed to pay the proceeds of Tallman's life insurance policies to Ivers as the named beneficiary of the policies.  CMFG counters that, because the undisputed evidence establishes that Tallman lacked the capacity to enter a binding contract, Ivers cannot support his breach-of-contract claim with a valid agreement.   In the alternative, CMFG asserts a counterclaim to rescind the policies, pursuant to Minn. Stat. § 61A.11 (2016), because Application 1 and Application 2 contained willfully false or intentionally misleading information.  The Court addresses each contention in turn.

2.    The Court exercises diversity jurisdiction over this dispute, 28 U.S.C. § 1332(a), which requires the Court to apply Minnesota law.  *PHL Variable Ins. Co. v. 2008 Christa Joseph Irrevocable Tr.*, 782 F.3d 976, 979 (8th Cir. 2015).

3.    When resolving a contract dispute, the Court employs a preponderance of the evidence standard of proof.  *See ICC Leasing Corp. v. Midwestern Mach. Co.*, 257 N.W.2d 551, 555 (Minn. 1977); *see also State by Humphrey v. Alpine Air Prods., Inc.*, 500 N.W.2d 788, 791 (Minn. 1993) (applying preponderance standard to fraud cases in

which defendant seeks to avoid effects of a written instrument unless otherwise indicated by legislature).

4.    To prevail on his claim for breach of contract, Ivers must prove by a preponderance of the evidence contract formation, performance of any conditions precedent to his right to demand contract performance, and breach of the contract by CMFG.  *See Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014).

5.    CMFG asserts that Ivers's breach-of-contract claim fails because Tallman lacked the capacity to form a contract.[13]

6.    A party must have the capacity to enter a binding contract.  *See Krueger v. Zoch*, 173 N.W.2d 18, 20 (Minn. 1969).  A party possesses the capacity to contract if the contracting party understands the nature and effect of executing the contract.  *See id.*; 5 Williston on Contracts § 10:8 (4th ed. May 2017 Update).  Without more, neither age nor mental weakness is sufficient to demonstrate lack of capacity.  *See Krueger*, 173 N.W.2d at 21 (age); *Timm v. Schneider*, 279 N.W. 754, 755 (Minn. 1938) (mental weakness). Because a party is presumed to possess the required capacity to contract, the burden of

---

[13]    Because contract formation is an essential element of Ivers's breach-of-contract claim, CMFG did not waive its affirmative defense that Tallman lacked the capacity to contract.  *See First Union Nat'l Bank v. Pictet Overseas Tr. Corp.*, 477 F.3d 616, 622 (8th Cir. 2007) (explaining that a defense that "merely negates an element of the plaintiff's prima facie case . . . is not truly an affirmative defense and need not be pleaded" (internal quotation marks omitted)).

overcoming this presumption rests with the party asserting lack of capacity. 5 Williston on Contracts § 10:8 (4th ed. May 2017 Update).

7.      Whether a party has the capacity to execute a contract is a question of fact. *Rebne v. Rebne*, 13 N.W.2d 18, 19 (Minn. 1944). The relevant inquiry is whether a party possessed capacity to contract when the contract was executed. 5 Williston on Contracts § 10:8 (4th ed. May 2017 Update).

8.      Here, CMFG primarily presents circumstantial evidence as to Tallman's mental capacity. CMFG neither presented medical records nor produced any evidence addressing Tallman's consideration of whether to apply for life insurance. Although the evidence demonstrates that Tallman suffered both physical and mental deficits, the evidence also shows that, during the APS investigation into Tallman's wellbeing, Tallman stated clear preferences regarding his living circumstances and his care. And APS credited Tallman's statements during its investigations to determine Tallman's best interests.

9.      It is CMFG's burden to demonstrate that Tallman lacked the capacity to contract when CMFG issued Tallman life insurance. CMFG fails to do so. APS, an agency whose purpose and expertise is to evaluate an individual's wellbeing, found Tallman sufficiently competent to credit and rely on his assertions during APS's investigations. CMFG's evidence on this issue of fact does not demonstrate that Tallman lacked the capacity to understand the nature and effect of his actions when he executed contracts for life insurance. Moreover, Minnesota law disfavors a party bound by a

contract utilizing lack of capacity "as an offensive weapon to avoid obligations . . . later [discovered] to be burdensome." *Krueger*, 173 N.W.2d at 21. Accordingly, while the evidence presents a close contest, the Court concludes that CMFG fails to establish by a preponderance of the evidence that Tallman lacked the capacity to contract at the time he submitted Application 1 and Application 2. *See B-Kam, LLP v. Floding*, No. 08-5168, 2011 WL 1258501, at *12 (D. Minn. Mar. 30, 2011) (concluding that defendant failed to meet "the very high bar necessary to demonstrate lack of capacity to contract" under Minnesota law despite plaintiff being confused and driving a manual transmission for hundreds of miles in a single gear); *see also Miles v. Lawrence*, No. 10-CV-34, 2011 WL 13086566, at *18-19 (D. Wyo. Apr. 15, 2011) (determining that defendant's evidence fell "well short" of establishing lack of capacity under analogous Wyoming law, despite plaintiff's limited ability to read or absorb legal documents).

10.    The Court next addresses CMFG's counterclaim to rescind the life insurance policies it issued to Tallman. Specifically, CMFG contends that Tallman's responses to questions in both Application 1 and Application 2, which indicated that he did not have any injury or illness that prevented him from working, were willfully false or intentionally misleading.

11.    Minnesota law provides that "[i]n any claim upon a policy issued in this state without previous medical examination, . . . the statements made in the application as to the age, physical condition, and family history of the insured shall be valid and binding

24

upon the company, unless willfully false or intentionally misleading." Minn. Stat. § 61A.11.

12.    A statement is willfully false or intentionally misleading when that statement is made with the "intent to deceive." *Larson v. Nw. Mut. Life Ins. Co.*, 855 N.W.2d 293, 299 (Minn. 2014) (applying Minn. Stat. § 61A.11). This standard is a subjective one. *Id.* The insurer bears the burden of demonstrating that a false statement was made with the "intent to deceive," which can be established "by inference when the insured had knowledge of material facts and failed to disclose those facts to the insurer." *Id.* Whether an alleged misrepresentation has been made with fraudulent intent is a question of fact to be resolved by the factfinder. *Id.* at 300.

13.    The relevant inquiry focuses on "the statements made in the application" and the subjective intent attached to those statements. Minn. Stat. § 61A.11 (statements); *Larson*, 855 N.W.2d at 299 (subjective intent). Rescission may be appropriate if someone other than the insured included willfully false or intentionally misleading statements on the insured's application for life insurance. *Cf. Ellis v. Great-West Life Assurance Co.*, 43 F.3d 382, 387-88 (8th Cir. 1994) (permitting rescission even though the insured's husband completed the application), *abrogated on other grounds by Larson*, 855 N.W.2d at 299.

14.    To demonstrate that rescission is warranted, CMFG also must establish that the alleged willfully false or intentionally misleading statements on the applications substantially affected or impaired CMFG's ability to make a reasonable decision to

25

assume the risk of coverage in issuing the policies.  *See Howard v. Aid Ass'n for Lutherans*, 272 N.W.2d 910, 912-13 (Minn. 1978); *see also Ellis*, 43 F.3d at 386-87.

15.    The overwhelming evidence demonstrates that the answer of "No" in response to question number 8 in Application 1 was willfully false or intentionally misleading.  Question number 8 asks "Are you currently unable to work because of any illness or injury?"  Ivers represented to APS on numerous occasions that he moved in with Tallman because Tallman's physical health was deteriorating.  Ivers thereafter held himself out as Tallman's caregiver.  This occurred nearly 2 years before CMFG received Application 1.  And two months *prior* to the submission of Application 1, APS investigated Tallman's condition and classified Tallman as a vulnerable adult pursuant to Minnesota law.  Following a thorough investigation, APS determined that Tallman's "mental infirmities" impaired Tallman's ability to "provide adequately for [his] own care without assistance (housing, food, clothing, medical care, medication management, money management, supervision) and impair[ed] [Tallman's] ability to protect [himself] from maltreatment."  During this timeframe, APS determined that Tallman required a fulltime caretaker and that Ivers was responsible for Tallman's cooking, shopping, cleaning, bathing and finances.

16.    Regardless of whether Tallman, Ivers, or both submitted Application 1 to CMFG for life insurance, the response to question number 8 in Application 1 was willfully false or intentionally misleading.  At the time Application 1 was submitted to CMFG, Tallman was unable to work because of an illness.

17.    CMFG presented uncontroverted evidence that it would not have issued Policy 1 if CMFG had received truthful and accurate information in response to question number 8 in Application 1.

18.    For these reasons, CMFG is entitled to rescind Policy 1.

19.    The overwhelming evidence demonstrates that the answer "No" in response to question number 1 in Application 2 was willfully false or intentionally misleading. Question number 1 asks "Has illness or injury caused you to retire, or are you currently unable to work because of injury or illness?"  In December 2013, three months after CMFG received Application 1, APS initiated a second investigation into Tallman's wellbeing.  During this investigation, Ivers reported that he did practically everything for Tallman and that Tallman required reminders to bathe.  Wolfson, the APS social worker responsible for the second investigation, determined that Tallman had difficulty finding words, was unable to recall his family members and could not remember whether he smoked.  Wolfson agreed with Ivers's assessment that Tallman could not walk the short distance necessary to renew his apartment lease.  In Wolfson's professional opinion, Tallman lacked the capacity to hold a menial job when she conducted APS's second investigation.  Similar to its first investigation, APS classified Tallman as a vulnerable adult and concluded that, if left alone, Tallman would require nursing-home placement. APS concluded its second investigation into Tallman's condition ten days *before* Application 2 was submitted.

27

20.     Regardless of whether Tallman, Ivers, or both submitted Application 2 to CMFG for life insurance, the response to question number 1 in Application 2 was willfully false or intentionally misleading.  At the time Application 2 was submitted to CMFG, Tallman was unable to work because of an illness.

21.     Uncontroverted evidence establishes that CMFG would not have issued Policy 2 if CMFG had received truthful and accurate information in response to question number 1 in Application 2.

22.     For these reasons, CMFG is entitled to rescind Policy 2.

23.     Because CMFG is entitled to rescind both of the life insurance policies at issue in this litigation, Ivers's breach-of-contract claim must fail because Ivers cannot establish the formation of a binding contract—an essential element of a breach-of-contract claim.

## ORDER

Based on the foregoing findings of fact and conclusions of law and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendant CMFG Life Insurance Company, d/b/a CUNA Mutual Group's counterclaim to rescind Term Life Insurance Policy NJ7892177 and Term Life Insurance Policy NJ7978554, (Dkt. 7), is **GRANTED** and these policies are **RESCINDED**.

2.     Plaintiff Robert Ivers's claim for breach of contract, (Dkt. 1-1), is **DENIED**.

3.    Because the parties did not address the issue of refunding premium payments—and because it appears that CMFG previously refunded these premiums to Ivers—the Court need not address this issue.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  June 29, 2017                                  s/Wilhelmina M. Wright____
                                                      Wilhelmina M. Wright
                                                      United States District Judge

29